Filed 4/17/23  In re J.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.A., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E080077 |
| Plaintiff and Respondent, | (Super.Ct.No. J288629) |
| v. | OPINION |
| J.G., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Catherine Wollard, Deputy County Counsel, for Plaintiff and Respondent.

1

The juvenile court terminated defendant and appellant, J.G.'s (mother), parental rights as to J.A. (the child; born May 2019).[1]  On appeal, mother contends the court erred in declining to apply the beneficial parental relationship exception to termination of her parental rights.  Mother also maintains both the juvenile court and plaintiff and respondent, the San Bernardino Children and Family Services (the department), committed reversible error by failing to comply with their duty of inquiry with respect to the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.).  We affirm.

I.  FACTUAL AND PROCEDURAL BACKGROUND

On March 3, 2021, the maternal grandmother reported that mother and the child were living in mother's vehicle or staying in motels.  Mother would drop the child off with the maternal grandmother for hours at a time but pick him up at night.  The child had previously lived "about 90% of the time" with the maternal grandmother.  She had released the child recently to mother because mother had custodial rights to him.

Mother reportedly kept alcohol and marijuana accessible to the child in her car.  Mother had improperly secured him in his car seat; mother would sometimes drive with him in her lap.  Mother "'cusses out'" the child "like he 'is a grown man' and tries to 'whoop on' him when he is not listening or when he cries for other family members."  Mother allegedly used drugs; she had a hearing at the end of the month for use and sales of narcotics.  The maternal grandfather said mother would return the child to them

---

[1]  The court also terminated father's parental rights.  Father is not a party to the appeal.

"'dirty, nasty,'" and they would have to buy him new clothes. Mother purportedly had mental health issues.

The social worker noted the pungent smell of marijuana coming from mother's car. Mother said she used substances and that if she tested, "'[a]nything and everything could show up on the results.'" On March 23, 2021, the social worker obtained a detention warrant.

On March 25, 2021, department personnel filed a Welfare and Institutions Code section 300[2] juvenile delinquency petition alleging mother had substance abuse issues (b-1), had a drug lifestyle and mental health issues (b-2), had mental health issues (b-4), was homeless (b-5), and belittled and screamed at the child (c-6).

At the detention hearing on March 26, 2021, the court asked mother if anyone in her family had Native American ancestry; mother answered, "No." Mother informed the court she had filled out the ICWA 020 form. Mother indicated on the form that she had no Native American ancestry insofar as she was aware. The court detained child.

In the jurisdiction and disposition report filed April 20, 2021, the social worker recommended the court remove the child from mother's custody and grant her reunification services. The social worker concluded that ICWA did not apply; on April 14, 2021, mother reported she had no Native American ancestry.

Pursuant to the parties' agreement after mediation, the department made minor changes to the b-1 and b-2 allegations; the court found them true, dismissed the b-4, b-5,

---

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

3

and c-6 allegations, removed the child from mother's custody, and ordered reunification services for mother. The court found ICWA did not apply.

On November 5, 2021, in the status review report, the social worker recommended the court continue services for mother. The social worker concluded ICWA did not apply. Mother had been convicted on September 15, 2021, of carrying a loaded firearm. She tested positive for substances five times, negative seven times, and failed to show for one test.

The department initially placed the child in foster care; mother visited the child at the department's offices, supervised by the caregiver; no issues were reported other than mother playing "too rough" with the child.

The department later placed the child with the maternal grandmother on August 10, 2021. Mother visited the child at the maternal grandmother's home with no issues. The department increased visitation to twice weekly in late August.

Of the placement with the maternal grandmother, the social worker reported: "The home is a very nurturing environment for the child[], whereby [he] ha[s] adjusted comfortably in [his] environment and appear[s] to be bonded with the maternal grandmother. . . . [¶] The maternal grandmother's home is appropriate and meeting the child[]'s physical, emotional, and provisional needs at this time."

Mother submitted on the reports at the review hearing on November 9, 2021. The court continued mother's reunification services.

In the status review report filed on April 28, 2022, the social worker recommended the court terminate mother's reunification services and set the section 366.26 hearing. Mother tested positive for narcotics five times, negative six times, and missed two tests during the reporting period. Mother visited with the child twice weekly. The social worker concluded ICWA did not apply.

In an additional information for the court report filed May 25, 2022, the social worker reported that on May 23, mother again denied any Native American ancestry. The social worker attempted to contact the maternal grandmother on May 24 regarding any Native American ancestry but received no response.

At the hearing on May 25, 2022, mother's counsel requested an additional six months of services. Counsel for both the child and the department noted that mother had already received six months of services beyond that to which she was entitled due to the child's age. The court terminated mother's reunification services and set the section 366.26 hearing.

In a June 30, 2022, additional information for the court report, the social worker noted she had attempted to contact a maternal uncle on June 29; however, his number was not in service. The social worker spoke with F.L., a maternal great-aunt, who stated her great-grandmother was part Native American, but she did not know from what tribe she was descended.

The social worker inquired of the maternal grandmother on June 8, 2022, who denied any Native American ancestry. The social worker inquired of the maternal

grandmother regarding any other relatives whom the social worker could contact regarding additional information concerning Native American ancestry; the maternal grandmother did not provide any further information.

At the hearing on July 11, 2022, counsel for the department noted: "And with regards to ICWA, there appears to be relatives who remain outstanding, so we're asking the Court to make the further notice review also a further ICWA review." The court responded: "In my review of the file, the two names I have outstanding . . . would be the maternal [great-]aunt, [J.M.], and the maternal grandfather . . . ." The court set "a further notice review and further review under [ICWA] for August 12th, 2022 . . . ."

The social worker filed an additional information for the court report on August 12, 2022, in which she reported that she had attempted to call J.M., a maternal great-aunt, twice on August 11 but had not received a call back. The social worker was informed that the maternal grandfather was not a blood relative; he was mother's stepfather. The social worker left a message at the maternal grandmother's home on August 11 to speak with the two maternal uncles but had not received a return call. Also on August 11, mother again denied any Native American ancestry.

At the hearing on August 12, 2022, the court noted that it "had questioned whether [J.M.] had been questioned about [ICWA], as well as the maternal grandfather . . . . In reviewing the Court file, those were the only two individuals the Court found that had not been questioned regarding [ICWA]."

6

The court continued: "The social worker attempted to contact [J.M.] and called her twice and left a message and did not receive a call back. The mother again denied Native American ancestry, when the social worker was also informed [the maternal grandfather] is not a blood relative to the mother, as he is her stepfather. No contact information was provided for him. A message was left with the maternal grandmother's home in order to speak to the maternal uncles and there's been no call back. Previously, in the reports, there had been an attempt to contact [one of] the maternal uncle[s], but the phone was not in service. [¶] The maternal grandmother denied Native American ancestry. And the social worker asked the mother if there was any other relatives or family members who could provide information and there was no additional information to be provided."

The court found the department had complied with its duty of inquiry and found there was no reason to believe the child was an Indian child. It concluded ICWA did not apply. The court set the section 366.26 hearing.

In the section 366.26 report filed September 12, 2022, the social worker recommended the court terminate mother's parental rights and implement adoption as the permanent plan. The social worker reported ICWA did not apply. Mother had weekly visits with the child, which were supervised by one of the maternal uncles.

The social worker opined that the child "is appropriate for adoption due to his age of [three years' old]. The caregiver wants to adopt [the child] very much. She has been involved with him since birth. She states she loves [the child] because he is her

7

'grandbaby' and wants him to be with family instead of [in] foster care. [The child] is too young to understand what adoption is but he seeks [the maternal grandmother] to meet his needs and calls her 'momma.'" The maternal grandmother "states she loves him and wants him to have stability and permanency. [The maternal grandmother] has a very close relationship with [the child] and he calls her 'momma.' She added that she has the best interest of [the child] and want[s] to do what is right for him."

The maternal grandmother noted that "she is the only consistent maternal figure [the child] knows. [She] states she is able to give him the love and security he needs and deserves." The maternal grandmother "will meet the child's social needs by encouraging him to participate in school, community programs, and family gatherings that include aunts, uncles, and cousins."

Mother testified at the section 366.26 hearing on October 28, 2022, that the child was in her care for "a whole year." She was his sole caretaker; the child lived with mother. He had now been out of her custody for a little over a year. Before he was removed from her custody, she "had a strong bond with him." Mother believed that a strong bond still existed.

Mother visited the child three times weekly for an hour and a half. She video chatted with him on the phone 14 times weekly for a few minutes. Mother never missed a visit. The maternal grandmother and J.M. supervised visitation.

When mother showed up for a visit, the child says, "'Mom!' And he runs up and hugs me and hangs on my neck and won't let me go." "He snatches my face and kisses

8

me.  That is my baby.  He loves his mother very, very much."  "He will, like, grab me.  He loves to kiss me.  He is, like, 'Give me a kiss, Mom.'  And I will kiss him once.  And he will be, like, (demonstrating).  He runs up and hugs me.  He holds my neck like you can see in the picture.  He grabs me.  He kisses me.  He grabs my face and says, 'You give me kiss.'  And he grabs my face."  Mother introduced into evidence a four-month-old photograph in which she was holding the child and they were kissing each other.  "[M]y son loves me.  And I love my son dearly."

Mother continued:  "I draw with him, sometimes I pray with him."  "I play with him. . . .  I'm working on teaching him how to spell his name.  You know, he knows—I taught him his ABC's.  He knows his 123's.  You know, I'm teaching him things he should know.  You know, I talk to him about God."  Mother feeds him during visits.  The child wants her to change his diapers during visits.

"Every visit he cries, 'Mom, I want to go with you.'  And I have to slowly cry away, like, 'Son, you can't go with Mom right now.  Mom is trying her best to get to where you can come home to Mommy,' you know, but he wants to go home with me every time."  "And I explain to him when he says, 'Mom, can I go with you?'  And I explain to him why he can't be with me."  "And he cries to come with me all the time.  And it hurts me as a mom, you know, that I have to tell my child that he can't go with me, you know.  [¶]  And it's just hard to explain but—you know, he will call me on the phone on my video chat, and he will be, like, 'Mom, can you come and visit us, please.'  And I'm, like, you know, 'Son you have to ask your Nana,' or 'Son, you have to'—you

9

know, 'not right now at this time. We are not allowed'—'it's not our visit. [¶] And, you know, it's tearing my son up. I can see it, you know, in my son's face and his actions and everything that it's hurting him."

Mother believed termination of her parental rights would "hurt my child. That would make him devastated if he was never able to see his mom again. You know, it would hurt me, too, but it would hurt him more." "And it would be detrimental for my son to be removed out of my life."

Mother acknowledged that the child called the maternal grandmother "mom." Prior to removal, the child "spent a lot of time with my mother because she would call me and ask me can she see him. And I would let her see him. And, then, sometimes if I had something important to do—I don't trust nobody with my child but my mom." Both mother and the child were initially living with the maternal grandmother. However, for seven months, they lived in motels, but she "would let him go with my mom."

Mother's counsel argued the beneficial parental relationship exception to termination of parental rights applied. Both minor's counsel and counsel for the department cited *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), and argued any bond did not outweigh the benefit the permanency of adoption would provide the child.

The court indicated it had read the reports and considered the testimony. The court found "there is clear and convincing evidence that the child is both generally [and] specifically adoptable." The court discussed the *Caden C.* requirements for application of the beneficial parental relationship exception to termination of parental rights. The

10

court noted that mother "has met her burden of proof regarding regular and constant visitation."

The court noted mother had "not been consistent in her answers as to how much time [the child] has spent in her custody prior to the removal and later being placed with the maternal grandmother." The court rendered a factual finding that the child had "extensive contact with the maternal grandmother," and mother had left the child in the maternal grandmother's care prior to removal. The court found there was a bond between mother and the child, but that it did not rise "to the level of a case in which exceptional circumstances exist in order for the Court to choose a lesser option other than adoption."

The court found mother had failed to meet her burden on the second and third elements of *Caden C.*: "While the Court acknowledges there is a bond and [the child] asks to go with his mother at the end of a visit, there's been no testimony that [the child] is crying inconsolably at the end of the visits that he . . . is having emotional dis-regulation, nightmares, insomnia, or anything of that, which would lead the Court to believe that it would be detrimental to terminate the parental rights." The court terminated mother's parental rights.

## II.  DISCUSSION

### A.  *Beneficial Parental Relationship Exception*

Mother contends the court erred in declining to apply the beneficial parental relationship exception to the termination of her parental rights. We disagree.

11

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them. [Citation.] According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. [Citation.] As we have previously explained, '[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.)

"The exception at issue in this case is limited in scope. It applies where '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.] From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*,

12

*supra*, 11 Cal.5th at p. 631.)  It is the parent who must prove all three elements by a preponderance of the evidence; the parent must "show a '*compelling* reason for determining that termination would be detrimental to the child . . . .'" (*Id.* at p. 635.)

Here, the court found that mother "has met her burden of proof regarding regular and constant visitation."  The court also impliedly found there was a beneficial relationship between mother and the child; the court found there was a bond between them, and that the child asked to go with mother at the end of visits.[3]  Thus, we address only the third prong, detriment.

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home.  [Citation.]  By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship.  [Citations.]  What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.)  "[T]he question is just

---

[3] The court expressly ruled that mother had failed her burden of proof under both elements two and three of the *Caden C.* formulation; however, its factual findings contradict that ruling on the second element.

whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

"[W]hether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "A court abuses its discretion only when ""'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'"" [Citation.] But ""'[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'""" (*Id.* at p. 641.)

The court acted within its discretion in finding that termination of mother's parental rights would not be detrimental to the child. Here, the child was approximately 18 months at the time he was taken into protective custody. However, as the court found, the child had spent the overwhelming majority of his life in the care of the maternal grandmother. The child would cry for other family members when mother took custody of him.

Department personnel placed the child with the maternal grandmother within five months of taking him into protective custody. The social worker noted: "The home is a very nurturing environment for the child[], whereby [he] ha[s] adjusted comfortably in [his] environment and appear[s] to be bonded with the maternal grandmother. . . . [¶] The maternal grandmother's home is appropriate and meeting the child[]'s physical, emotional, and provisional needs at this time." "The caregiver wants to adopt [the child]

14

very much.  She has been involved with him since birth.  She states she loves [the child] because he is her 'grandbaby' and wants him to be with family instead of [in] foster care.  [The child] is too young to understand what adoption is but he seeks [the maternal grandmother] to meet his needs and calls her 'momma.'"

Even mother acknowledged that the child called the maternal grandmother "mom."  Mother, herself, only entrusted the maternal grandmother with the care of the child.

The maternal grandmother had known the child since his birth.  She loved him "and wants him to have stability and permanency."  The maternal grandmother had a very close relationship with him.  She expressed that she had his best interests in mind and wanted what was best for him.  The maternal grandmother believed she was "the best-suited adult to adopt [the child]."  She was "the only consistent maternal figure he knows."  The maternal grandmother believed she would be "able to give him the love and security he needs and deserves."  She would "meet the child's social needs by encouraging him to participate in school, community programs, and family gatherings that include aunts, uncles, and cousins."

Mother failed to make a compelling showing that the loss of the child's relationship with her would harm him to an extent not outweighed, on balance, by the security of a new, adoptive home with the maternal grandmother.  Thus, the court acted within its discretion in determining the circumstances were not exceptional, such that the termination of mother's parental rights would not be detrimental to the child.

15

*B.     ICWA*

Mother contends the department failed its duty of further inquiry under ICWA by not inquiring of "readily available relatives," such as two maternal uncles, who lived with the maternal grandmother, and two maternal great-aunts.  Mother further argues the department failed to conduct further inquiry regarding F.L.'s claim that her great-grandmother was part Native American.

The department responds that since the child was removed pursuant to a custody warrant, rather than pursuant to section 306, it had no duty to inquire of extended family members.  (*In re Adrian L.* (2022) 86 Cal.App.5th 342, 353 (conc. opn. of Kelley, J.) [Despite the parties' agreement the department had a continuing duty to inquire of extended relatives pursuant to ICWA, such a duty is only applicable to those children taken into temporary custody, not those removed pursuant to a warrant.].)[4]  Moreover, the department maintains the court's ICWA finding should be presumptively affirmed because mother has failed to proffer evidence as to why further inquiry would lead to a different result.

"""Federal regulations implementing ICWA . . . require that state courts "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." [Citation.]  The court must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian

---

**4**  The department fails to identify that the authority they cite in *Adrian L.*, is to the concurring, not the majority opinion.

16

child.""'" [Citations.] 'State law, however, more broadly imposes on social services agencies and juvenile courts (but not parents) an "affirmative and continuing duty to inquire" whether a child in the dependency proceeding "is or may be an Indian child."'" (*In re J.C.* (2022) 77 Cal.App.5th 70, 77.)

"Section 224.2 ""creates three distinct duties regarding ICWA in dependency proceedings.""' [Citations.] First, section 224.2, subdivision (b), requires the child protective agency to ask 'the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' [Citations.] Although commonly referred to as the 'initial duty of inquiry,' it 'begins with the initial contact' [citation] and continues throughout the dependency proceedings." (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 77.)

"Second, if the court or child protective agency 'has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child,' the court and the Department 'shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' [Citations.] Third, if the further inquiry ""results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply.""' (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 78.)

"""The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings.'" [Citation.] "If the court makes a

finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence.'"'" (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 78.)

Section 224.2, subdivision (b), applies only "[i]f a child is placed into the temporary custody of [the] department pursuant to [s]ection 306." (§ 224.2, subd. (b).) Therefore, the department would only appear to be required to inquire regarding the Native American ancestry of extended relatives when the child has been taken into temporary custody. The department would thus, appear not to be required to make such inquiries when, as here, the child is taken into custody pursuant to a warrant. (*In re Adrian L.*, *supra*, 86 Cal.App.5th at pp. 357-358 (conc. opn. of Kelley, J.).) Nevertheless, we need not decide that issue because any error in failing to inquire of the extended relatives was harmless.

"Because the failure here concerned the *agency's* duty of . . . inquiry, only state law is involved. Where a violation is of only state law, we may not reverse unless we find that the error was prejudicial." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742.) "[I]n ICWA cases, a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*In re Benjamin M.*, at p. 744 [The department "failed its duty

18

of inquiry by not asking 'extended family members' . . . whether there is reason to believe [the child was] an Indian child."]; compare *In re Dezi C.* (2022) 79 Cal.App.5th 769, 779, review granted Sep. 21, 2022, S275578 ["[A]n agency's failure to conduct a proper initial inquiry into a dependent child's Native American heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding."]; contra, *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1003, 1006 ["[A]n automatic reversal approach to claims of ICWA inquiry errors is not compelled by the statute, harms the interests of dependent children, and is not in the best interests of Indian communities."  "Plainly, complying with the literal language of the statute—that is, making an *initial* and *further* ICWA inquiry of every member of a child's extended family . . . is absurd at best and impossible at worst."]; contra, *In re M.B.* (2022) 80 Cal.App.5th 617, 629-630 [per se reversal where department and juvenile court failed their duties of ICWA inquiry].)

As is obvious from the citations listed *ante*, when it comes to the harmless error standard for cases in which the department has failed to make an "adequate" inquiry, appellate courts have come to myriad conclusions.  (See *In re K.H.* (2022) 84 Cal.App.5th 566, 608, and the cases cited therein.)  The issue is presently before our Supreme Court in *In re Dezi C*. (2022) ___ Cal.5th ___ [2022 Cal. Lexis 5629].

Until the Supreme Court resolves the issue, stare decisis persuades us that we should apply the standard most recently adopted by this court.  Under this standard,

"a court must reverse . . . where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*In re Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744; accord, *In re D.B.* (2022) 87 Cal.App.5th 239, 245; *In re Ricky R.* (2022) 82 Cal.App.5th 671, 679; but see *In re K.T.* (2022) 76 Cal.App.5th 732, 742; *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430-1431.)

"ICWA defines an 'Indian child' as a child who is either (1) 'a member of an Indian tribe' or (2) 'eligible for membership in an Indian tribe and . . . the biological child of a member of an Indian tribe[.]' (25 U.S.C. § 1903(4).) Conversely, if the child is not a tribe member, and the mother and the biological father are not tribe members, the child simply is not an Indian child." (*In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1520.)

Here, we find that there was no prejudice because there was no readily obtainable information *that would bear meaningfully on whether the child was an Indian child*. There was no reason to believe that the child was a member of any Native American tribe or eligible for membership as the biological child of a member of any tribe.

Mother repeatedly denied any Native American ancestry. (*In re S.R.* (2021) 64 Cal.App.5th 303, 312, 316 [Where the parents initially represented that the minor did not have Native American ancestry, the court's ICWA finding was "plainly supported at the time it made the finding."].) The maternal grandmother denied any Native American ancestry and could not provide additional information regarding other relatives who might provide relevant information.

The social worker attempted to call J.M. twice on August 11, 2021, but never received a call back.  The social worker also inquired regarding the maternal grandfather but was informed he was mother's stepfather and not a blood relative.

The social worker contacted F.L., "who reported that her great-grandmother in Texas was part Native American."  However, she did not know what tribe her great-grandmother's ancestry derived from and provided no further information as to how the social worker could make further inquiries.

The social worker also made attempts to contact a maternal uncle on June 29 and August 11, 2022; however, on the first attempt, his phone was not in service; he never returned her subsequent call.  The social worker attempted to contact another maternal uncle on August 11, but did not receive a return call.  Thus, to the extent the department was even required to inquire regarding any Native American ancestry of extended relatives, any error was harmless because there was no reason to believe that the child was a member of any Native American tribe or eligible for membership as the biological child of a member of any tribe.

Mother argues that the department did not inquire of the two maternal uncles who lived in the home of the prospective adoptive parent, the maternal grandmother.  However, as noted *ante*, the social worker did attempt to inquire of the maternal uncles, but received no response.

Mother complains, with reason, that the social worker waited until the day before the hearing to attempt to contact the maternal uncles.  However, as noted *ante*, the social

21

worker attempted to contact one of the maternal uncles on June 29, 2022, more than a month before the hearing at which the court found ICWA did not apply. Moreover, although the other maternal uncle was contacted only the day before the hearing, an additional month went by before the court terminated mother's parental rights. There is no indication that either of the maternal uncles ever returned the social worker's phone calls.

Furthermore, the maternal grandmother was in just as good a position as the maternal uncles to know whether her family had Native American ancestry; her denial of any such ancestry satisfied the department's duty of inquiry. Indeed, when the social worker inquired of the maternal grandmother regarding any other relatives whom the social worker could contact regarding additional information concerning Native American ancestry, the maternal grandmother did not provide any further information despite the fact that the maternal uncles were purportedly living with her.

Mother complains, again with reason, that the social worker only attempted to contact J.M. about her Native American ancestry the day before the hearing. However, again, an additional month went by before the court terminated mother's parental rights. There is no indication that J.M. ever returned the social worker's phone calls.

Finally, mother complains that the social worker made no further inquiry of F.L., who reported her great-grandmother was part Native American. However, F.L. did not know what tribe her great-grandmother's ancestry derived and provided no further information as to how the social worker could make further inquiries. F.L.'s mythical

22

lore about Native American ancestry was so far removed from the child, both blood and consanguinity wise, that it was an effective dead end.  Thus, to the extent the department was even required to inquire regarding the Native American ancestry of extended relatives, any error was harmless because there was no reason to believe that the child was a member of any Native American tribe or eligible for membership as the biological child of a member of any tribe.

### III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.